UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:11-cv-22694-JLK

ELIO CONSTANZA, and all )
others similarly situated, )
 )
      Plaintiffs, )
 )
vs. )
 )
24 HOUR FITNESS, USA, INC., )
 )
      Defendant. )
_____)

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO COMPEL
ARBITRATION AND TO STAY PROCEEDINGS PENDING ARBITRATION**

      Defendant 24 HOUR FITNESS, USA, INC. ("Defendant") hereby files the instant Reply in Support of Motion to Compel Arbitration and to Stay Proceedings Pending Arbitration, and states the following in support of this Motion:

**A Valid And Enforceable Arbitration Agreement To Arbitrate Exists**

      Plaintiff does not dispute that the arbitration agreement Defendant presented to this Court covers his claims, and he does not dispute that the terms of the agreement are enforceable. Instead, he denies that he ever entered into an arbitration agreement in the first place. However, "[a] party does not place the making of the arbitration agreement in issue simply by stating no agreement exists." *Williams v. MetroPCS Wireless, Inc.*, 2010 U.S. Dist. LEXIS 5826, *23 (S.D. Fla. Jan. 5, 2010). The party must not only deny ever entering an arbitration agreement, but also "must substantiate the denial of the contract with enough evidence to make the denial colorable." *Chastain v. The Robinson-Humphrey Company, Inc.*, 957 F.2d 851 (11th Cir. 1992). Plaintiff denies that he entered into an arbitration agreement, but he has not presented colorable evidence to support his denial. In contrast, there is substantial evidence to support Defendant's assertion that Plaintiff did, in fact, enter into an arbitration agreement. A valid and enforceable agreement to arbitrate exists between the parties, and Defendant's Motion should be granted.

### A. Plaintiff's Application Is An Enforceable Arbitration Agreement

Plaintiff devotes most of his affidavit to explaining how he filled out his employment application. In fact, he devotes only one sentence to his denial of signing the other arbitration documents. Nonetheless, Plaintiff admits that he electronically signed his employment application. *See* Constanza Aff., ¶9. Irrespective of his denial regarding the other arbitration documents, this signature alone established an enforceable arbitration agreement.

Just above Plaintiff's signatures on the application, the following text appears:

> I understand that as an expeditious and economical way to settle employment disputes without need to go through courts, 24 Hour Fitness agrees to submit such disputes to final and binding arbitration. I understand that I may opt out of the arbitration procedure within a specified period of time, as the procedure provides. 24 Hour Fitness and I also understand that if I am offered employment and do not opt out, we both will submit exclusively to final and binding arbitration all disputes arising out of or relating to my employment. This means that a neutral arbitrator, rather than a court or jury, will decide the dispute.

*See* Defendant's Motion at Ex. 1. This is a valid and enforceable arbitration agreement. Plaintiff expressly agreed that, if he was offered employment and if he did not opt out, then he would be bound to submit any employment claims to arbitration. The language of this agreement was clear and unequivocal. The fact that the arbitration agreement was in an employment application does not make it any less enforceable. *See e.g. Henry v. Pizza Hut of America, Inc.*, 2007 U.S. Dist. LEXIS 72193 (M.D. Fla. Sept. 27, 2007) (enforcing arbitration agreement contained in employment application); *E.E.O.C. v. Taco Bell of America, Inc.*, 2007 U.S. Dist. LEXIS 18292 (M.D. Fla. Mar. 15, 2007) (same).

Plaintiff alleges that Defendant "falsely" suggested that the application may be a binding arbitration agreement and Plaintiff alleges that the application only binds Defendant to submit claims to arbitration. *See* Pltfs' Opp. at 5 n. 3. This is simply not true. The promise made by Plaintiff was clear: if he was offered employment (and he was) and if he did not opt out (and he did not), then he was bound to arbitrate employment disputes.

Plaintiff implies that, because the opt-out procedure was not yet known, there could not have been an arbitration agreement. However, he does not cite any caselaw to support this assertion, and Defendant is not aware of any. The fact that the details about how he could opt out, or when he could opt out, were not yet known, does not negate his unequivocal agreement to arbitrate. Plaintiff *cannot* claim he was unaware that his application included a promise to

arbitrate, and that it was binding unless he chose to opt out. Additionally, he electronically signed an "Arbitration Policy Opt-Out Information" form, which provided the details about how to opt-out (calling the employee hotline for an opt-out form) and the time period to do so (30 days after electronically signing the opt-out form). *See* Exhibit 1 (copy of Plaintiff's signed opt-out form). Plaintiff never opted-out of the arbitration agreement (at any time).

Plaintiff claims that he was "never provided an opportunity to 'opt-out' and in fact this was never discussed with me nor has any procedure ever been provided or discussed with me." *See* Constanza Aff., ¶10. Thus, he appears to dispute signing the arbitration opt-out form as well. The lack of credibility of such an assertion will be addressed below, in section B. Regardless, even if he did not receive information about the opt-out procedures (and he did), in order to "opt-out" of an arbitration agreement, Plaintiff had to have been "in" the agreement in the first place. Plaintiff does not claim that he ever attempted to find out how to opt-out, that he ever tried to opt-out, or that he ever even wanted to opt-out. Thus, any attempt to claim that a lack of knowledge of the opt-out procedures impacted him in some manner would be disingenuous, and basic principles of estoppel should bar any such argument.[1]

The fact that Defendant chose to provide employees with a more detailed explanation of the arbitration policy in its handbook, and a separate acknowledgment of the arbitration policy, does not make the arbitration agreement in the application any less of an enforceable agreement. The language in the application was clear and unequivocal. Plaintiff agreed that, if offered employment, any employment disputes would be subject to arbitration, unless he chose to opt-out of the arbitration agreement. He never opted out (and never attempted to opt-out) of the arbitration agreement that he signed, via his application. The application alone is sufficient to establish an arbitration agreement, and Defendant's Motion should be granted.

    **B.    Plaintiff Signed The Handbook And The Arbitration Policy, And He Has Not Provided Any Credible Evidence To The Contrary.**

Although Plaintiff went into detail in his affidavit about his application and signature of his application, he devoted a single sentence to his alleged denial of signing the arbitration policy

---

[1] At most, if Plaintiff never knew how long the time period was for him to opt-out (although he did know), then the "specified time period" by which he could opt-out should be interpreted as being anytime before bringing a claim (rather than the 30 days that the policy provided for). This would be consistent with the requirement to interpret contracts in a manner consistent with the intent of the parties, which was to agree to arbitrate, unless Plaintiff chose to opt-out within some period of time.

3

and handbook acknowledgment. The *entirety* of Plaintiff's denial in his affidavit is that he has "never seen, signed or received either the handbook or the Arbitration policy." *See* Constanza Aff., ¶11. He did not provide a single other detail in his affidavit to support his denial. Instead, Plaintiff provided the affidavit of Robert Moody who states that, based on his review of the hardcopy documents, "there are numerous issues . . that suggest that [the documents] are not what they reported to be." *See* Moody Aff., ¶6. Mr. Moody claims that there is a disparity on the dates in the applications that is not chronological or plausible, and that the alleged disparity suggests that the applications contain data of several applicants and/or cannot be tied to a specific applicant. *Id.*, ¶7-9. The information presented by Mr. Moody does not necessitate an expert, he is not properly offered as an expert, and the Court should strike his affidavit as not sufficiently reliable under Rule 702 of the Federal Rules of Evidence.[2] Regardless, none of the "issues" Mr. Moody raises are valid, and he is simply without the proper facts to make the sweeping and overreaching statements that he has made.

### 1. Selexpert: Defendant's Uniform Application And Hiring Process

In light of Plaintiff's denial and the "issues" that Mr. Moody has tried to raise, Defendant has provided an affidavit from Anileez Alamo, Defendant's former National Recruiting Administrator ("NRA"), to explain the application and hiring process in detail, as well as the automated system that the Company used for such matters. A copy of Ms. Alamo's affidavit is attached as Exhibit 2. Ms. Alamo's affidavit makes it clear that Plaintiff's denial lacks credibility, and the "issues" raised by Mr. Moody are not issues at all.

Defendant used a uniform automated process called Selexpert that all applicants and personnel involved in the application and hiring process were required to use, and Selexpert was

---

[2] Plaintiff is attempting to rely on Mr. Moody's affidavit as an expert in computer forensics. *See* Pltfs' Opp. at 5. However, Mr. Moody has not done anything other than review hard copy pieces of paper, and then offer speculative opinions made without sufficient facts to do so. This Court should strike his affidavit because it is not sufficiently reliable to be admissible under Federal Rule of Evidence 702 and the standards established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Mr. Moody is held out as an "expert," but his affidavit fails to establish that: (1) he is qualified to testify competently regarding the matter he intends to address; (2) the methodology by which he reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Douglas*, 489 F.3d 1117, 1124-25 (11th Cir. 2007). While there is certainly nothing improper about the Plaintiffs attempting to raise the issues that Mr. Moody raised as questions for the Court to consider in its analysis, the assertions made by Mr. Moody do not merit expert testimony, and it is improper for Plaintiff to try and present this information in the manner in which he has done.

used at each step of the application and hiring process. *Id.*, ¶5. A Selexpert Reference Guide provides a general description of the various processes and procedures related to the use of the system. *Id.*, ¶6; *Id.* at Ex. A. As Plaintiff described in his affidavit, the application process was conducted online, via a link on the Company's website that took applicants to Selexpert. *Id.*, ¶7. Plaintiff fails to mention, however, that Selexpert required all applicants to create a personal and unique security code of up to six characters, and the code was not available to *anyone* at the Company other than the NRA (who had access to a database of the codes on Selexpert so she could give it to individuals who forgot what code they had created). *Id.*, ¶¶8-10. Management at the clubs had no ability to access the code database maintained by the NRA. *Id.*, ¶10. To sign an application on Selexpert, applicants had to enter their first and last name *and* their social security number. *Id.*, ¶12. When an applicant clicked the "my signature" button on the application to enter their electronic signature, Selexpert automatically inserted "signed electronically" on the signature line and automatically inserted the date next to the signature line. *Id.*

Management at the clubs accessed Selexpert by entering the club number and a manager's password. *Id.*, ¶14. Selexpert allowed management to view applications, but *only* as a .pdf file, and managers had no way to add, delete, or change any information on the applications. *Id.*, ¶15. Selexpert even removed social security numbers from the manager's view of the application. *Id.* Management also used Selexpert to track the process/progress of each applicant, and they coded applicants throughout the hiring process to identify what stage/status they were in. *Id.*, ¶16. In Selexpert, "Hired" meant that an offer was extended to the applicant by the manager, and that new hire paperwork was being completed and sent to HR. *Id.*, ¶17. When an applicant's status was changed to "Hired," the onboarding process began. *Id.*

The first part of the onboarding process was that applicants came to the club and had to review and submit *all* required new hire documents, and the New Team Member Handbook Receipt Acknowledgment, the Arbitration of Disputes Policy, and Arbitration Policy Opt-Out Information were three of the required documents. *Id.*, ¶18. All new hire documents were accessed by applicants at a computer terminal in the club. *Id.*, ¶19. Applicants were directed to a link that took them to the Selexpert New Hire Paperwork Log In Screen. *Id.* The applicants *could not* access the new hire paperwork unless they entered the security code that they had

created when they filled out their application and their social security number.[3] *Id.; see also id.* at Ex. A, p. 11. If an applicant forgot their security code, they could click a link and have the code e-mailed to their personal e-mail address (the one they provided when they filled out their application), or they could call the NRA to request their code. *Id.*, ¶9.

Just like the application, the applicant was required to electronically sign each document in the new hire paperwork. *Id.*, ¶20. The applicant electronically signed each document by entering their initials and clicking an "click to accept" button, which inserted "signed digitally" into the signature line, and Selexpert automatically placed the applicant's name at the top of the document (except on the government forms). *Id.* Selexpert also automatically entered the date on the handbook acknowledgment, W-4, and I-9. *Id.* Selexpert did not allow an applicant to submit any of the new hire paperwork without the electronic signature. *Id.*, ¶21.

The first part of the onboarding process could not be completed until *all* of the new hire paperwork was electronically signed and submitted by the applicant, and if a required document was missing, then it had to be signed and submitted before the process could move forward. *Id.*, ¶22. Just as with the applications, managers could go on Selexpert and view the applicant's new hire paperwork, and Selexpert did not provide managers with any way to add, delete, or change any information on the documents.[4] *Id.*

After the applicant properly completed all of the new hire paperwork, Selexpert displayed a message that informed the applicant that they could print the documents for their records, and that they would hear from a Company representative if they successfully completed the background check (the second part of the onboarding process). *Id.*, ¶23. If the applicant cleared the background check, then the applicant was approved for hire, and an employee identification number could be issued. *Id.*, ¶24. An employee identification number could not be issued prior to such clearance, and *nobody* could begin working for 24 Hour Fitness until an employee identification number was issued. *Id.* The date an employee id number was issued is the employee's official date of hire (absent an administrative issue such as a delay in approving an

---

[3] If an applicant could not come to the club, the manager could e-mail the applicant a link to the New Hire Paperwork Log In Screen, and the documents could complete the documents remotely, after successfully logging in with their name, security code, and social security number. *Id.*, ¶19.

[4] The exception was I-9 forms, since managers had to fill in certain Company information. However, Selexpert only gave managers access to the fields on the I-9 form that required Company information, and the rest of the fields were blocked from access for any purpose other than viewing. *Id.*

6

employee's starting rate of pay; if that occurred, the date of hire could be later than the date when the employee id number was issued) *Id.*

Plaintiff could not have received an employee identification number (*i.e.*, began working for Defendant) unless he had actually seen, signed, and received the arbitration policy, arbitration opt-out form, and handbook acknowledgment on Selexpert, along with all of the other new hire paperwork. *Id.*, ¶26. Selexpert was specifically designed to ensure that the applicant, and only the applicant, could access, review and sign their required new hire paperwork on the system. *Id.*, ¶28. Selexpert provided the same complete set of new hire paperwork to each and every person, and it is not possible that Plaintiff could have received some of the new hire documents, but not those he denies seeing or signing. *Id.*; *see also id.*, Ex. A, p. 12.

### 2. There Are No Illogical Date Disparities On Plaintiff's Application Or Handbook Acknowledgment, Nor Any Other "Issues"

Contrary to Plaintiff's assertion, there are no date disparities or any other issues that call the legitimacy of the application, arbitration policy, handbook acknowledgment, or any other documents into question. A copy of the new hire paperwork that Plaintiff signed is attached to Ms. Alamo's affidavit. *See* Ex. 1 at Ex. B. These documents, including the dates on his application, are logical, chronological, and consistent with the Selexpert application and onboarding process.

As noted above, when an applicant electronically signed the application and clicked the "my signature" button, Selexpert automatically filled in the date next to the digital signature line. *See* Ex. 1, ¶¶12, 31. The date was automatically generated by Selexpert, and there was no way for any manager (or other employee) to add, delete, or change it. *Id.* The date that Plaintiff electronically signed and submitted his applications, as noted on his applications (next to the electronic signature line), was May 17, 2010. *See* Defendant's Motion at Ex. 2. In a transparent attempt to create confusion, Plaintiff has misstated when he applied for employment with Defendant. Plaintiff says he completed his application on June 1, 2010. *See* Constanza Aff., ¶3. The facts establish that *this* assertion is illogical and incorrect.

After an offer of employment is made to an applicant, managers can electronically submit a "new hire" form. *See* Ex. 1, ¶34. Plaintiff's new hire form was first signed and submitted by his manager on May 26, 2010. *See* Ex. 1 at Ex. C. A second new hire form was signed and submitted by his manager on June 3, 2010, because the recommended pay rate required

supplemental approval. *Id.* It would be illogical (and implausible) for a manager to submit a new hire form before someone ever applied for employment with Defendant. However, if Plaintiff is to be believed, then his first new hire form was submitted ***eight days*** before he applied for employment with Defendant. That is clearly not what occurred, and the dates of application that Plaintiff provided in his affidavit is wrong. The date that was electronically inserted by Selexpert at the end of his application, next to his electronic signature (a signature that Plaintiff admits he provided), is correct.

Plaintiff has also misrepresented what the information HIRED means on his application. As discussed above, all "HIRED" meant is that an *offer* was extended, and that the new hire paperwork was being completed and sent to Human Resources. *See* Ex. 1, ¶33; *see also* Ex. 1 at Ex. A, p. 8 (Selexpert Reference Guide). On the first page of Plaintiff's application, in the box that says "position applied for," it says "Membership Counselor (Sales Counselor)." *See* Def. Motion at Ex. 1. Also in that box, the word "HIRED" appears, with a date. *Id.* In Plaintiff's application, it says "HIRED May 26, 2010." *Id.* When Plaintiff's status was changed to HIRED in Selexpert, Selexpert automatically inserted the date of that status change into this box on his application. *See* Ex. 1, ¶33.[5]

It appears that all Plaintiff did was locate the latest date that appears anywhere on his application, and claim it as his application date, to create confusion. However, there is no confusion. At the top of Plaintiff's application it says "today's date," and the date filled in is June 1, 2010. *See* Def. Motion at Ex. 1. However, this is *not* the date that Plaintiff filled out his application. All dates on the application were inserted automatically by Selexpert and could not be inserted manually. *See* Ex. 1, ¶36. Plaintiff was issued an employee identification number on June 1, 2010. *Id.,* ¶37. When an employee identification number was issued to an applicant, Selexpert automatically inserted that date into the "today's date" box of the employment application. *Id.*

Plaintiff has not pointed out *any* illogical or implausible date disparities. He simply provided incorrect information about his date of application, and attempted to create confusion

---

[5] Applicants often came to the club to fill out their new hire paperwork on the same day they were notified of their job offer. *See* Ex. 1, ¶35. This appears to be what Plaintiff did as well. The date on Plaintiff's signed handbook acknowledgment and on his signed W-4 is May 26, 2010 (*i.e.*, the same day he was given an offer). *See* Ex. 1 at Ex. B.

from there. In contrast, a look at his application and hiring process with the actual facts, shows that there is nothing illogical or implausible about the dates on his application (or any other document). None of the other "issues" raised by Mr. Moody are actually "issues" at all either.

Mr. Moody claims that there is an issue because "the signature section [on the application] is blank." *See* Moody Aff., ¶10. However, the signature section on Plaintiff's application is not blank; it is signed electronically. *See* Def. Motion at Ex. 1. He also claims the handbook acknowledgment is suspect because it says "signed digitally" in the signature block, the employee "ID" does not appear, and Plaintiff's name appears at the top of the documents. *See* Moody Aff., ¶¶11-13. However, the fact that the documents say "signed digitally" does not impact the validity of the electronic signature. The employee ID does not appear on the handbook acknowledgment because the ID was not issued until the completion of the hiring process, while the handbook was signed earlier in the process. *See* Ex. 1, ¶¶18, 22, 24. Selexpert automatically inserted the applicant's name onto the top of all of the new hire documents (except for government forms), for identification purposes, and there is nothing suspect about that at all. *Id.*, ¶20; *see also id.*, Ex. B.

In the end, all Plaintiff has done is deny that he signed the arbitration policy and handbook acknowledgment, and present incorrect, incomplete, and/or misleading information in an attempt to support the denial. In contrast, Defendant has provided substantial evidence to show that the application and hiring system contained numerous measures to ensure the accuracy and legitimacy of the review and electronic signature of application and hiring documents, and to show that, in fact, Plaintiff did sign all of the arbitration documents. In such a situation, it is proper to conclude that he did electronically sign the arbitration policy and handbook acknowledgment. *See e.g. Martyn v. J.W. Korth & Co.*, 2011 U.S. Dist. LEXIS 59416, * (W.D. Mich. Jun. 1, 2011) (motion to compel arbitration granted because defendant offered "more than sufficient evidence" to establish that the plaintiff had electronically signed the agreement and the plaintiff merely denied it was her electronic signature).[6]

---

[6] The cases that Plaintiff relies on as analogous are not; they are distinguishable. In *Schoendorf v. Toyota of Orlando*, 2009 U.S. Dist. LEXIS 33528 (M.D. Fla. Apr. 21, 2009), the plaintiff offered witness testimony (of her sister) to independently verify her claim that the handwritten signature on the arbitration agreement was not her signature, the defendant did not offer substantive evidence to show that the signature could have been her signature, and the court found the plaintiff's version of events to be credible. In contrast, Plaintiff here is really just relying on his denial, and nothing else, and his credibility is in question, given the clear and obvious facts presented by Defendant establishing that the date he

9

**Conclusion**

For all of the foregoing reasons, and the reasons previously stated in Defendant's Motion, Defendant respectfully requests that the Court issue an Order staying the instant action and compelling Plaintiff to proceed with his claims in arbitration, in accordance with the terms of the Arbitration Agreement.

DATED this 17th day of October 2011.

> Respectfully submitted,
>
> LITTLER MENDELSON, P.C.
> One Biscayne Tower, Suite 1500
> Two South Biscayne Blvd.
> Miami, Florida  33131
> Tel:  (305) 400-7500; Fax: (305) 603-2552
>
> By:   */s/ Aaron Reed*
> Aaron Reed
> Florida Bar No. 557153
> E-mail: areed@littler.com
> Linda Noël
> Florida Bar No.  0659606
> E-mail:  lnoel@littler.com
>
> Counsel for DEFENDANT

---

claims to have applied for employment is false.  In *Owren, Inc. v. Connolly*, 877 So. 2d 918 (Fla. 4th DCA 2004), the plaintiff denied signing the arbitration agreement, and the defendant was not even able to produce a signed agreement to the court.  That is not the case in this action.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 17th day of October 2011, a true and correct copy of the foregoing was electronically filed and served via transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

*/s/ Aaron Reed*_____
Aaron Reed

## SERVICE LIST

Roderick V. Hannah, Esq.
E-mail: *rhannah@rhannahlaw.com*
RODERICK V. HANNAH, ESQ., P.A.
4120 Davie Road Extension, Suite 303
Davie, Florida  33024
Tel: (954) 362-3800
Fax: (954) 362-3779

Pelayo M. Duran, Esq.
E-mail: *ecf@duranandassociates.net*
LAW OFFICE OF PELAYO DURAN, P.A.
4640 N.W. 7th Street
Miami, Florida  33126-2309
Tel: (305) 266-9780
Fax: (305) 269-8311

Firmwide:104545925.2 034670.1262